## TOWN OF GLENARDEN v. BROMERY, ET AL.
[No. 320, September Term, 1969.]

\* \* \*

## COUSINS, ET AL. v. BROWN, ET AL.
[No. 321, September Term, 1969.]

*Decided February 11, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, SINGLEY and SMITH, JJ.

*Alfred L. Scanlan,* with whom were *Shea & Gardner* and *Patricia A. Trivers* on the brief, for appellants.

Amicus Curiae Brief filed by The Maryland Municipal League. *Joseph S. Casula* on the brief.

*Charles A. Dukes, Jr.* for appellees.

HAMMOND, C. J., delivered the opinion of the Court.

By adopting a number of amendments to the town charter, the electorate of Glenarden replaced a mayor and a set of councilmen during their terms with another mayor and another set of councilmen. The displaced persons here challenge the effectiveness of the charter amendments to validly accomplish the change in terms and officials.

Glenarden is a municipality that sometime ago availed itself of the authorizations of Art. XI-E of the Constitution of Maryland (the Municipal Home Rule Amendment) and of Code (1957), Art. 23A, the implementing statute, its charter being in all significant respects one contemplated by Art. 23B of the Code, titled Municipal Corporation Charter.

At a regular election called for by the original charter held on May 5, 1969, Mayor Cousins who had served for some twenty-eight years was reelected over the appellee Trotter, and six councilmen aligned with the Mayor also were elected. Four members of the prior council became lame ducks, having failed of reelection. Perhaps for this reason the Town Council, after the election but before its successors took office, approved petitions of Glenarden citizens proposing ten amendments to the Town Charter, and on September 15, 1969, at an election ordered by Judge Digges, sitting in the Circuit Court for Prince George's County, the voters approved all the amendments. Number 2 provided that there be six councilmen to be elected for two-year terms (for no more than three consecutive terms), and Number 3 made the term of the mayor two years, with a limit of two consecutive terms. Under the original charter, the terms were for four years. Number 4 established regular town elections on the first Monday in May in odd numbered years, and amendment Number 7 set up a special election and directed that the mayor and councilmen elected at that special election should serve as such until the next regular election.

Various legal proceedings and counter-proceedings followed the adoption of the amendments. Finally, Judge Bowen in the Circuit Court for Prince George's County issued a mandatory injunction requiring the holding of a special election for all town offices on November 21, 1969.

Of 755 votes cast for Mayor at the November 21st election, the appellee Trotter, who had lost the May 5th election, received 354 while the incumbent Mayor Cousins who had won in May received 311. Two other candidates split the remaining votes. Since no candidate received a majority, a run-off election was held on December 22, in which Mr. Trotter beat Mayor Cousins. Six councilmen were elected in November, including two incumbents and two members of the Trotter faction who had been beaten in the May election, Messrs. Brown and Jackson.

The appellants are the Town, Mr. Cousins, and the six councilmen who were elected on May 5; the appellees include Mr. Trotter, Messrs. Brown and Jackson, and other citizens and taxpayers of the Town.

The appellants at the argument limited their contentions to the claims that the special election of November 21 was an exercise in the governmental process of recall of elected officials for which there is neither constitutional nor statutory authority in Maryland, and that the charter amendments reducing the terms of office of the mayor and the councilmen from four to two years, if construed to be applicable and effective prior to the regular town election of May 1973, are both unconstitutional and illegal until that time.

The appellants point out that the terms of those elected on November 21 were neither for two nor for four years, and that in the present posture of the matter the candidates elected on May 5 had enjoyed a five and one-half month term, those elected on November 21 will serve to early June 1971 or for a term of 19 months, while those elected at the next regular election in May 1971 will serve the newly prescribed term of two years. From this

they argue that "in every meaningful sense the special election represents an attempt by the Town electorate, for purely political reasons, to recall elected public officials prior to the expiration of the term of office for which they had been elected." The argument goes on to urge that the recall in the sense here relevant is a governmental associative cousin of the initiative and the referendum, all representing mechanisms by which the electorate reserve to themselves powers ordinarily given without reservation to the legislators representing the voters.[1]

Appellants next seek to find comfort in the fact that the referendum was made part of the Maryland governmental scheme by amendment to the constitution in 1915 (and since then often is found in municipal charters) but that the power to recall elected officials never has been made a part of the Maryland political scheme. They argue that the legislature lacks the inherent power to provide for recall and therefore could not delegate the right to provide for recall locally and that, assuming the legislature could so delegate, it has not seen fit to do so in Glenarden's case. Finally, they plead that "the recall should not be introduced into Maryland in disguise" lest every mayor and councilman tremble ever in his boots in a continuous fear that the electorate at any moment will strip him of his powers, prestige and emoluments— a fear the Maryland Municipal League indicates in its brief as amicus that it shares.

The arguments of the appellants are well marshalled and skillfully presented. Their fatal weakness is, however, that the recall procedure has nothing to do with the case. By Art. XI-E of the Constitution and Art. 23A

---

1. The initiative, the referendum and the recall all originated in the cantons of Switzerland, and in whole or in part were considered in the Constitutional Convention of 1787, and after 1900 adopted in whole or in part by various States. Rappard, Initiative, Referendum and Recall in Switzerland, Annals of the American Academy of Political and Social Sciences (September 1912); 19 Ency. Brit. 14 (1959); Morrison, The Oxford History of the American People 815 (1965); Dulles, The United States since 1865, 186 (1959).

of the Code, the citizens of Glenarden were given the legal right and power to do exactly what a majority of them did—that is, amend the charter of their town to bring about a form of government contemplated by Art. XI-E of the Constitution and the statute, that is, Art. 23A of the Code. The fact that the exercise of the right to amend the charter of Glenarden resulted in shortening the terms of the mayor and councilmen of that town just as the exercise of a power to recall, had one existed, would have done is coincidental, and does not make the permitted process of amendment the withheld or forbidden process of recall. This is not a situation in which that which we call a rose by any other name would smell as sweet.

In *Hitchins v. Mayor & City Council of Cumberland*, 208 Md. 134, 140-141, Chief Judge Brune for the Court made an elaborate analysis of Art. XI-E of the Constitution (the Municipal Home Rule Amendment) and Art. 23A of the Code, pointing out in the process, first, that §§ 3 and 4 of Art. XI-E provide that:

"Sec. 3. Any such municipal corporation, now existing or hereafter created, shall have the power and authority, (a) to amend or repeal an existing charter or local laws relating to the incorporation, organization, government, or affairs of said municipal corporation heretofore enacted by the General Assembly of Maryland, and (b) to adopt a new charter, and to amend or repeal any charter adopted under the provisions of this Article.

"Sec. 4. The adoption of a new charter, the amendment of any charter or local laws, or the repeal of any part of a charter or local laws shall be proposed either by a resolution of the legislative body of any such municipal corporation or by a petition containing the signatures of at least five per cent of the registered voters of a municipal corporation and filed with the

legislative body of said municipal corporation. The General Assembly shall amplify the provisions of this section by general law in any manner not inconsistent with this Article,"

and, second, that § 11 of Art. 23A prescribes that "Every municipal corporation in this State shall proceed as in this sub-heading provided in exercising and applying the powers for the amendment of municipal charters which are granted thereto by Article XI-E of the Constitution of Maryland," and that §§ 12, 13 and 14 "contain provisions authorizing the adoption of charter amendments and permit them to be initiated by action of the legislative body of the municipality through a majority vote of all persons elected to such legislative body or by petition of at least 20% of the qualified voters of the municipality." Judge Brune thereafter said (at p. 143 of 208 Md.) :

"We think, however, that this is clearly a case in which the provisions of Sections 11-18 of Art. 23A of the Code, enacted to implement Article XI-E, and particularly to implement Section 4 thereof, occupies the whole field of amendments to charters of municipalities * * *. Article XI-E of the Constitution authorizes amendments of the charters of all municipal corporations (with certain exceptions not here material), and Sections 11-18 of the Code prescribe how such municipal corporations shall make amendments to their charters, and the methods prescribed differ from those of the old Charter of Cumberland. That the general provisions of the Code were meant to be all-inclusive is, we think, clear. This view is fortified by the provisions of Article XI-E which manifest strongly and explicitly an intention that the Legislature shall deal with the charters of municipalities in matters pertaining to their incorporation, organization, government or af-

fairs on a general basis and shall not enact local legislation to amend the charters of individual municipalities. Correlatively, the solution of local problems is left to local action by the adoption or amendment of charters of municipalities to be effected in accordance with general laws. While we find no difficulty in reaching this construction of the Constitutional and Code provisions and hence there is no need to resort to any extrinsic aids to construction, we note that these provisions are in harmony with the recommendations of the Sobeloff Commission which were before the General Assembly and which seem to have served as the basis for the Constitutional Amendment and the implementing legislation."

*See also Mayor of Hagerstown v. Lyon*, 236 Md. 222.

It is conceded that all of the ten amendments to the Charter of Glenarden adopted on September 15, 1969, save amendment Number 7, were proper and appropriate provisions to be included in its municipal charter under Articles 23A and 23B of the Code. We think that the voters of Glenarden had the power to adopt amendment Number 7 in order to facilitate and effectuate the transition from four-year terms for the Mayor and councilmen to two-year terms. Section 2 (29) of Art. 23A gives to a municipality covered by its provisions the express power "to provide for special elections for municipal purposes, at such times and places as may be determined, and subject to the provisions of the charter of said municipality." Number 7 required an election if more than three simultaneous charter amendments were adopted and its obvious intent was to further Glenarden municipal purposes by arranging for the election of officials for the interim term from the time of the special election until the next regular election.

In our view there is no compelling force to the argument of the appellants that if amendments 2, 3 and 4 are

construed and applied so as to divest Mayor Cousins and the councilmen elected with him in May of their offices and the emoluments thereof they would be unconstitutional. In *Higginbotham v. Baton Rouge*, 306 U. S. 535, 83 L. Ed. 968, the Supreme Court reiterated that the legislative power of a State, except so far as restrained by its own constitution, is at all times absolute with respect to all offices within its reach, so that it may at pleasure create or abolish them, or modify their duties, and may also shorten or lengthen the term of service. The Supreme Court had held in *Crenshaw v. United States*, 134 U. S. 99, 33 L. Ed. 825, that appointment to and tenure of an office created for the public use do not come within the import of the term "contracts" as used in the Constitution or, in other words, within the vested, private, personal rights intended by the Constitution to be protected. The Court said:

> "The selection of officers, who are nothing more than agents for the effectuating of such public purposes, is a matter of public convenience or necessity, and so, too, are the periods for the appointment of such agencies * * *. It follows then, upon principle, that, in every perfect or competent government, there must exist a general power to enact and to repeal laws; and to create, and change or discontinue, the agents designed for the execution of those laws."

In Rhyne, *Municipal Law* (1957), the author says (p. 141-142) that an official's claim to tenure is not protected by the contract clause of the Federal Constitution and that a legislature may diminish the term of or entirely abolish an elective office. Mr. Rhyne says further (p. 147-148) that an office may be abolished at any time by a constitutional amendment even though the constitution provides that the officer shall hold office during the term for which he was elected, and that an office created by a charter may be abolished by charter amendment. The statement is supported by *Millard v. Guy* (Mich.), 55

N.W.2d 210, in which the Court held that an amendment to the charter of the City of Dearborn, approved by the voters, which provided for election of a municipal judge and an associate municipal judge for six-year terms and set a salary for the associate which was less than the previous salary of each of two municipal judges properly and permissibly amounted to a bona fide abolition of the office of one municipal judge to take effect immediately, rather than an unconstitutional reduction in salary, term, duties and authorities of the office of a municipal judge. The Court also held that pursuant to the terms of the amendment the voters could elect a named individual as interim appointee to the office of associate municipal judge.

There have been similar holdings in Maryland. In *County Commissioners v. Supervisors of Elections,* 192 Md. 196, the Court, dealing with the transitional problems arising from the adoption of the charter form of government by Montgomery County, held that subsidiary governmental bodies have implied authority to exercise all such powers as may be necessary or fairly implied in or incidental to the enjoyment and exercise of their express powers, that a first charter may provide for the prompt special election of a first council and that the terms of the existing county commissioners of a county becoming a charter county are not unlawfully shortened by the transfer by the charter of their powers and duties to the council since "the Commissioners hold their offices subject to the possibility that they may be ousted under the provisions of the Home Rule Amendment providing for the adoption of a charter." The Court held that the County Commissioners of Montgomery County were not entitled to an injunction banning the holding of a special election to elect a County Council.

In *Brown v. Brooke,* 95 Md. 738, Ch. 442 of the Laws of 1892 had provided for three county commissioners for Anne Arundel County to hold office for two, four and six years respectively as the governor should designate. The appellants in that case were in office as such county

commissioners, their terms not having expired, when Ch. 13 of the Laws of 1901 became effective to repeal the Act of 1892 and to provide that at the general election of November 1901 seven county commissioners should be elected for Anne Arundel County to hold office for two years, and that upon their qualification "the terms of the present County Commissioners of Anne Arundel County shall cease and determine as fully as if when elected they had only been elected to serve until that time." The individuals elected in November 1901 sought and were granted by the lower court a writ of mandamus directing the old commissioners to surrender their offices. The order was affirmed without opinion by an equally divided Court of Appeals.

We were told at the argument that the transfer of offices from the Cousins faction to the Trotter faction had been effected peacefully if not fraternally. We shall not disturb the results of the direct and energetic participation by the voting citizens of Glenarden in remoulding the form of their government and arranging for a change in the identity of their political agents and servants, and therefore will affirm the orders appealed from.

*Orders affirmed, with costs.*